HARRIS, Judge (concurring):
 

 ¶45 I concur in full in the majority opinion. My agreement with Sections II and III is enthusiastic. I have reservations about the analysis in Section I, but concur nonetheless for two reasons. First, Defendant did not raise or argue the issues that concern me, and therefore reversal in this case would not be appropriate. Second, and more substantively, I agree that the result the majority reaches in Section I is indeed driven by Utah Supreme Court precedent that this court is bound to follow, and the lead opinion ably describes that governing law and applies it to the facts of this case. I write separately to express my view-for whatever it might be worth-that the governing law might warrant re-examination in a future case. Specifically, I have concerns about the propriety of admitting, pursuant to rule 404(b) of the Utah Rules of Evidence, evidence of a defendant's prior bad acts under the "doctrine of chances" to rebut a defense of fabrication, and I wonder whether our law should either reconsider the conclusions reached in
 
 State v. Verde
 
 ,
 
 2012 UT 60
 
 ,
 
 296 P.3d 673
 
 ,
 
 abrogated on other grounds by
 

 State v. Thornton
 
 ,
 
 2017 UT 9
 
 ,
 
 391 P.3d 1016
 
 , or consider adoption of a categorical rule (akin to rule 413 of the Federal Rules of Evidence ) that simply admits, in a more up-front way, evidence of similar crimes in sexual-assault cases that is typically being admitted anyway.
 

 I
 

 ¶46 Anglo-American rules of evidence have long contained a general prohibition against the admission of evidence that a criminal defendant committed previous bad acts-separate from the crime with which he is charged-that are similar to the acts he stands accused of committing.
 
 See, e.g.
 
 , David P. Leonard,
 
 The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events
 
 § 1.2, at 2 (2009) (hereinafter "Leonard") (stating that "[o]ne of the oldest principles of Anglo-American law is that a person should not be judged strenuously by reference to the awesome spectre of his past life," but instead by whether the person committed the specific acts with
 which he is charged (quotation simplified)). Utah's evidentiary rules are no exception: our rules state that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1).
 

 ¶47 This rule finds its origins not in logic, but in policy.
 
 See
 

 People v. Zackowitz
 
 ,
 
 254 N.Y. 192
 
 ,
 
 172 N.E. 466
 
 , 468 (1930) (Cardozo, J.) (stating that the "principle" behind the ban on propensity evidence "is one, not of logic, but of policy"). Indeed, such evidence is excluded
 

 not because it has no appreciable probative value, but because it has too much. The natural and inevitable tendency of the tribunal-whether judge or jury-is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge.
 

 Leonard, § 1.2, at 6-7 (quoting 1 John H. Wigmore,
 
 Evidence in Trials at Common Law
 
 § 194, at 646 (3d ed. 1940));
 
 see also
 

 Michelson v. United States
 
 ,
 
 335 U.S. 469
 
 , 475-76,
 
 69 S.Ct. 213
 
 ,
 
 93 L.Ed. 168
 
 (1948) (stating that propensity evidence is "not rejected because character is irrelevant," but because such evidence denies defendants "a fair opportunity to defend against a particular charge").
 

 ¶48 But this general historical rule is peppered with so many exceptions that it often gets lost in the shuffle.
 
 [16]
 
 Indeed, our rule of evidence allows admission of evidence of a defendant's prior bad acts if such evidence is used "for another purpose" (other than demonstrating "that on a particular occasion the person acted in conformity with the character").
 
 See
 
 Utah R. Evid. 404(b)(2). The rule even lists a number of possible "other purposes" for which prior bad acts evidence might be admitted, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."
 

 Id.
 

 In this vein, our supreme court has stated that "[s]o long as the evidence is not aimed at suggesting action in conformity with bad character, it is admissible under rule 404(b)."
 
 Verde
 
 ,
 
 2012 UT 60
 
 , ¶ 15,
 
 296 P.3d 673
 
 .
 

 ¶49 The difficulty, of course, lies in attempting to determine when evidence is offered for a permissible non-propensity purpose and when a party is merely attempting to dress up propensity evidence as something else in order to gain its admission.
 
 See
 

 id.
 
 ¶ 16 (stating that "it won't always be easy for the court to differentiate" between permissible and non-permissible prior bad acts evidence). Some jurisdictions, in a nod to the difficulties inherent in trying to elicit such fine distinctions, have determined-through legislation, rulemaking, or common-law development-that at least some kinds of propensity evidence ought to be categorically admissible in sexual assault cases. About half of the fifty states have judicially recognized a common-law "lustful disposition" exception to the general ban on propensity evidence.
 
 See
 
 Basyle J. Tchividjian,
 
 Predators and Propensity: The Proper Approach for Determining the Admissibility of Prior Bad Acts Evidence in Child Sexual Abuse Prosecutions
 
 ,
 
 39 Am. J. Crim. L. 327
 
 , 338-39 & n.51 (2012) (listing the jurisdictions that have adopted this common-law exception). And some jurisdictions, most notably the federal courts through the enactment of rules 413 and 414 of the Federal Rules of Evidence, categorically allow the admission of prior bad acts in sexual assault cases.
 
 See
 
 Fed. R. Evid. 413,
 414. Rule 413 covers "sexual assault" cases generally, and rule 414 covers "child molestation" cases. Each rule allows the court to "admit evidence that the defendant committed any other" sexual assault or child molestation, without regard to whether the evidence is offered for any of the rule 404(b)(2) purposes.
 
 See
 

 id.
 

 R. 413(a), 414(a) ;
 
 see also
 
 Michael L. Smith,
 
 Prior Sexual Misconduct Evidence in State Courts: Constitutional and Common Law Challenges
 
 ,
 
 52 Am. Crim. L. Rev. 321
 
 , 323-24 & nn. 6-21 (2015) (noting that a handful of states, including Utah, have implemented a version of one or both of these rules).
 
 [17]
 

 ¶50 In 2008, Utah enacted a version of rule 414 of the Federal Rules of Evidence, and now categorically allows propensity evidence in child molestation cases, regardless of whether that evidence meets the requirements of rule 404(b)(2).
 
 See
 
 Utah R. Evid. 404(c) (stating that, "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged"). However, Utah has not enacted any version of rule 413 of the Federal Rules of Evidence, nor has it ever adopted any version of the "lustful disposition" exception, meaning that in cases where the defendant stands accused of sexually assaulting anyone who is fourteen years of age or older, there is no categorical rule allowing admission of that defendant's prior acts of sexual assault. Prosecutors attempting to introduce such evidence in adult sexual assault cases must demonstrate that the evidence they proffer meets the requirements of rule 404(b)(2).
 

 II
 

 ¶51 A pair of leading commentators (including a Utah federal judge) have observed, in their treatise on the Utah Rules of Evidence, that "[i]f the prior bad acts involve sexual misconduct, or child abuse, or a combination of both, courts generally find a theory of admissibility, even if no specific theory of admissibility makes sense."
 
 See
 
 R. Collin Mangrum & Dee Benson,
 
 Mangrum & Benson on
 

 Utah Evidence
 
 227 (2018-19 ed.);
 
 see also
 
 Kenneth J. Melilli,
 
 The Character Evidence Rule Revisited
 
 , 1998 B.Y.U. L. Rev. 1547, 1556 (1998) (hereinafter "Melilli") (stating that "creative prosecutors will usually be successful in generating a theory for introducing evidence of the defendant's prior, uncharged misbehavior before the jury"). One theory that-increasingly in recent years-has been harnessed for this purpose is a "theory of logical relevance" known as the "doctrine of chances" (the Doctrine).
 
 See
 

 Verde
 
 ,
 
 2012 UT 60
 
 , ¶ 47,
 
 296 P.3d 673
 
 .
 

 ¶52 The Doctrine is controversial,
 
 see
 
 Melilli, at 1564 (referring to the Doctrine as "the real hinterland of Rule 404(b) metaphysics"), and a full discussion of its purposes and applications is beyond the scope of this opinion. As I explain below, I do not take issue here with the Doctrine's application in certain contexts (such as, for instance, to rebut a defense of mistake or accident), but I am unconvinced-for two reasons-of the wisdom of our supreme court's extension of the Doctrine to rebut fabrication defenses. First, I have doubts about whether the Doctrine can logically be applied in that context consistently with the historical propensity bar. Second, I wonder whether the Doctrine's application in this context runs afoul of the non-controversial principle that probability evidence is inadmissible to show that a witness is (or is not) telling the truth. I will discuss these two concerns, in turn, after a brief description of the Doctrine and its origins.
 

 A
 

 ¶53 As described by our supreme court, the Doctrine is "a theory of logical relevance
 that rests on the objective improbability of the same rare misfortune befalling one individual over and over."
 
 Verde
 
 ,
 
 2012 UT 60
 
 , ¶ 47,
 
 296 P.3d 673
 
 (quotation simplified);
 
 see also
 

 State v. Lopez
 
 ,
 
 2018 UT 5
 
 , ¶ 52,
 
 417 P.3d 116
 
 (stating that doctrine of chances cases "involve rare events happening with unusual frequency"). At root, the Doctrine is simply "probability reasoning."
 
 Verde
 
 ,
 
 2012 UT 60
 
 , ¶¶ 50, 53,
 
 296 P.3d 673
 
 ;
 
 cf.
 

 Hopt v. People
 
 ,
 
 120 U.S. 430
 
 , 440,
 
 7 S.Ct. 614
 
 ,
 
 30 L.Ed. 708
 
 (1887) (referring to the "doctrine of chances" as a tool used to "establish a probability").
 

 ¶54 The Doctrine has been widely applied to rebut a defendant's claim that a series of extremely unlikely events are nothing more than coincidences or unfortunate accidents. There are several famous examples, including one first articulated in 1884 and quoted in
 
 Verde
 
 :
 

 Suppose you lose your horse; you find it in the possession of A.; he asserts that he took the horse by mistake; but you find that about the same time he took horses belonging to several others; would not the fact that he took others about the same time be proper evidence to be considered in determining whether the particular taking was or not by mistake? The chances of mistake decrease in proportion as the alleged mistakes increase.
 

 2012 UT 60
 
 , ¶ 48,
 
 296 P.3d 673
 
 (quotation simplified). Similarly, in the case of the "Brides in the Bath,"
 
 Rex v. Smith
 
 , 11 Crim. App. 229, 84 L.J.K.B. 2153 (1915) (also referred to in
 
 Verde
 
 ,
 
 2012 UT 60
 
 , ¶ 49,
 
 296 P.3d 673
 
 ), a defendant was accused of murder when three successive spouses died while taking a bath, and evidence of the circumstances surrounding the deaths of the other two spouses was admitted at the murder trial of the first spouse, for the purpose of showing the defendant had caused the first death. In another more recent example, multiple infants had died in their sleep while in the care of the defendant, and evidence of previous deaths was admitted to rebut the defendant's claim that the death in question was accidental.
 
 See
 

 United States v. Woods
 
 ,
 
 484 F.2d 127
 
 , 135 (4th Cir. 1973) (also cited in
 
 Verde
 
 ,
 
 2012 UT 60
 
 , ¶ 49,
 
 296 P.3d 673
 
 ). In these cases, the Doctrine did not function as an independent exception to the prohibition on character evidence; rather, its logic was used to explain the probative value of prior bad acts evidence that was introduced pursuant to other exceptions (usually to rebut a defense of mistake or accident) that are listed in rule 404(b)(2).
 

 ¶55 When applied to rebut a defense of mistake or accident, evidence of previous similar events is relevant not necessarily to show that the defendant had a propensity to commit similar crimes, but to show that it was practically impossible-as a matter of probability-for the events to have occurred accidentally as the defendant claimed. As our supreme court stated in
 
 Verde
 
 , "[p]ropensity inferences do not pollute this type of probability reasoning," because "[t]he question for the jury is not whether the defendant is the type of person who, for example, sets incendiary fires or murders his relatives."
 
 2012 UT 60
 
 , ¶ 50,
 
 296 P.3d 673
 
 . Instead, "[t]he question is whether it is objectively likely that so many fires or deaths could be attributable to natural ca[u]ses."
 

 Id.
 

 This evidence "tends to prove a relevant fact without relying on inferences from the defendant's character," and is therefore not impermissible propensity evidence.
 
 Id.
 
 ¶ 51.
 

 B
 

 ¶56 I have no quarrel with application of the Doctrine to rebut a defense of accident or mistake, because I agree that such application does not necessarily require the forbidden inference that a defendant has acted in conformity with his character or propensity.
 
 Id.
 
 ¶¶ 50-51 ;
 
 see also
 
 Andrea J. Garland,
 
 Beyond Probability: The Utah Supreme Court's "Doctrine of Chances" in
 
 State v. Verde
 
 Encourages Admission of Irrelevant Evidence
 
 , 3 Utah J. Crim. L. 6, 27 (2018) (criticizing our supreme court's application of the Doctrine in
 
 Verde
 
 , but acknowledging certain "proper uses" for the Doctrine, including application "to rebut claims of accident"). I cannot see how the same holds true, however, when the Doctrine is used to admit evidence to rebut a defense of fabrication.
 
 [18]
 

 ¶57 The trigger for any application of the Doctrine is the occurrence of a "rare misfortune" that "befall[s] one individual over and over."
 
 See
 

 Verde
 
 ,
 
 2012 UT 60
 
 , ¶ 47,
 
 296 P.3d 673
 
 . In applying the Doctrine to rebut a defense of accident, it is often easy to discern what the "rare misfortune" is-for instance, the death of a bride in a bathtub, or the mistaken taking of a horse. In applying the Doctrine to rebut a defense of fabrication, however, it is not as easy to discern what the "rare misfortune" is that triggers application of the Doctrine. As near as I can tell, the "rare misfortune" in this context must be either (a) that the defendant has been
 
 falsely
 
 accused of nonconsensual sexual assault on multiple occasions,
 
 see
 

 id.
 
 ¶ 45 (describing the State's argument as that it is "highly unlikely that three victims would independently fabricate similar accounts of unwanted sexual contact"), or (b) that the defendant has merely been accused-whether falsely or accurately-of nonconsensual sexual assault on previous occasions,
 
 id.
 
 ¶ 53 (stating that the Doctrine might be applied "based on the low probability that multiple victims would independently accuse the defendant of similar assaults"). Regardless of whether the triggering event is (a) or (b), the Doctrine doesn't seem to work in this context.
 

 ¶58 If the triggering "rare misfortune" is previous
 
 false
 
 accusations of sexual assault, one would expect the State-in order to properly invoke the Doctrine-to actually put on evidence of previous
 
 false
 
 accusations of sexual assault. But I have yet to find a doctrine of chances case in which any evidence was put on that, in previous cases, the defendant was
 
 falsely
 
 accused of sexual assault. (No prosecutor in her right mind would want to do such a thing, presumably because jurors might think that, if it happened before, it might have happened again.) Instead, in the typical case, the State seeks to introduce evidence that the defendant was
 
 credibly
 
 accused of sexual assault in previous cases.
 
 See, e.g.
 
 ,
 
 id.
 
 ¶¶ 6-9 ;
 
 State v. Balfour
 
 ,
 
 2018 UT App 79
 
 , ¶¶ 31-33,
 
 418 P.3d 79
 
 ,
 
 cert. denied
 
 ,
 
 429 P.3d 465
 
 (Utah 2018). As a matter of logic, then, if the State seeks to introduce evidence of previous
 
 true
 
 accusations of sexual assault pursuant to the Doctrine, the triggering event of "rare misfortune" cannot possibly be the fact that the defendant was
 
 falsely
 
 accused of sexual assault in previous cases.
 

 ¶59 But using previous accusations-regardless of their truth or falsity-as the "rare" triggering event also suffers from logical problems. If one assumes that the accusations are true, and that the defendant actually committed the previous sexual assaults, it becomes extremely difficult to distinguish such evidence from straight-up propensity evidence.
 
 See
 
 Melilli, at 1568 (pointing out that "the explanation for the [Doctrine] in the multiple-accusers context is simply a convoluted explanation of the general propensity inference," because "[e]ach separate accusation would have no bearing upon the accuracy of another allegation
 but for the conclusion that the multiple accusations demonstrate a cross-situational pattern of behavior, which is but a variation on the taboo inference of a general propensity or character trait"). And if one stops short of assuming that the accusations are true, and simply uses accusations-regardless of their truth or falsity-as the "rare" triggering event, that brings its own set of logical problems. As one commentator astutely points out, there is "something awry with rules of evidence that permit the trier of fact in a rape case to infer guilt based merely on prior accusations of rape, but, at least in principle, ordinarily will not allow the trier of fact to infer guilt based on the fact that the accused is actually guilty of rape on prior occasions."
 
 Id.
 
 at 1566.
 

 C
 

 ¶60 The other problem I see with application of the Doctrine to rebut a defense of fabrication is that such application allows the introduction of probability evidence for the avowed purpose of demonstrating that the complaining witness is more likely to be telling the truth. Our law allows such evidence in no other context, and it does not appear that our supreme court has ever examined the extent to which
 
 Verde
 
 is inconsistent with its other jurisprudence around this issue.
 

 ¶61 Decades ago, in
 
 State v. Rammel
 
 ,
 
 721 P.2d 498
 
 (Utah 1986), our supreme court drew a hard line regarding the admissibility of probability or statistical evidence to speak to a witness's credibility. In that case, the credibility of the prosecution's star witness was at issue; that witness was telling a different story at trial than he had told in his first interview with police.
 
 See generally
 
 id.
 

 The prosecution attempted to shore up the witness's credibility by calling a police detective to testify that, in his experience, it was not unusual for individuals to lie the first time they met with police.
 

 Id.
 

 at 500
 
 . The trial court allowed the testimony, but the supreme court reversed, for three reasons.
 

 ¶62 First, the court noted that, "[a]lthough a witness's credibility may always be impeached, the impeaching evidence must go to
 
 that
 
 individual's character for veracity," and probability evidence does not go to a particular individual's character for truthfulness.
 

 Id.
 

 Second, the court determined that the police officer did not have "foundation" to testify anecdotally about the probability of people telling the truth.
 

 Id.
 

 at 501
 
 . Third, and most relevant here, the court held as follows:
 

 Even where statistically valid probability evidence has been presented-and [the officer's] testimony hardly qualifies as such-courts have routinely excluded it when the evidence invites the jury to focus upon a seemingly scientific, numerical conclusion rather than to analyze the evidence before it and decide where truth lies.
 
 Probabilities cannot conclusively establish that a single event did or did not occur and are particularly inappropriate when used to establish facts not susceptible to quantitative analysis, such as whether a particular individual is telling the truth at any given time
 
 .
 

 Id.
 

 (emphasis added) (quotation simplified);
 
 see also
 

 State v. Burnett
 
 ,
 
 2018 UT App 80
 
 , ¶ 36 n.9,
 
 427 P.3d 288
 
 (citing
 
 Rammel
 
 , and determining that statistical evidence of probabilities that a particular witness was telling the truth was inadmissible).
 

 ¶63 As noted above, the Doctrine is simply a "probability theory" that speaks to the likelihood of a particular "rare" event occurring repeatedly.
 
 See
 

 Verde
 
 ,
 
 2012 UT 60
 
 , ¶ 47,
 
 296 P.3d 673
 
 . When the Doctrine is used to rebut a defense of fabrication, the prior bad acts evidence is admitted precisely because that evidence makes it more likely, from a probability standpoint, that the complaining witness is telling the truth. I cannot see a principled way to reconcile
 
 Rammel
 
 's rule forbidding the introduction of probability-based evidence in this context with
 
 Verde
 
 's application of the Doctrine to allow it.
 

 III
 

 ¶64 In the case before us, the trial court allowed three witnesses to testify that Defendant sexually assaulted them on previous occasions and, in addition, the court allowed a statistician to testify that there is a 0.0004 percent chance of a person being arrested even once for rape or attempted rape in
 Utah, and that the chances of such a thing happening to the same person four times was 1 in 16 trillion. The trial court admitted this evidence pursuant to the Doctrine, because the State offered it, in part, to rebut Defendant's claim that Victim had fabricated her account of the events in question. In this opinion, we affirm that decision, and I concur in that result because Defendant does not ask us to re-examine the applicability of the Doctrine in this context and, in any event, we are bound to follow the analysis set forth in
 
 Verde
 
 .
 
 [19]
 

 ¶65 But I have reservations about employing the Doctrine, in a case like this, to admit evidence of Defendant's prior bad acts. For the reasons set forth, I wonder whether application of the Doctrine in this context might warrant re-examination, specifically regarding whether such application is at odds with the historical ban on propensity evidence as well as the longstanding rule against admission of probability evidence to speak to a witness's credibility. Decisions about whether to re-examine
 
 Verde
 
 , or to enact a version of rule 413 of the Federal Rules of Evidence -two very divergent pathways-will be made above my pay grade. But I have concerns about whether we can or should continue down our current path, in which we routinely "allow[ ] character evidence to reach the jury while maintaining the pious fiction that we follow the character evidence rule."
 
 See
 
 Melilli, at 1569.
 

 One case in point: the lead opinion in this case describes rule 404(b) as a rule of
 
 inclusion
 
 .
 
 See
 

 supra
 
 ¶ 27 (stating that rule 404(b)"generally permits evidence of a defendant's other crimes, wrongs, or bad acts so long as the evidence has a probative value other than to show an evil propensity or criminal temperament" (quotation simplified)). The debate over whether the rule is exclusionary or inclusionary is an ancient one.
 
 Compare
 
 John Henry Wigmore,
 
 Treatise on the System of Evidence in Trials at Common Law
 
 § 193, at 231 (1904) (describing the rule as "a general and absolute rule of exclusion"),
 
 with
 
 Julius Stone,
 
 The Rule of Exclusion of Similar Fact Evidence: America
 
 ,
 
 51 Harv. L. Rev. 988
 
 , 990-91 (1938) (arguing that the rule is inclusionary, "excluding proof where the relevance was merely to the evil disposition of the accused");
 
 see also
 
 David P. Leonard,
 
 The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events
 
 § 4.3, at 206-19 (2009) (discussing historical views of the rule).
 

 These rules of evidence have generally been upheld against constitutional challenges, with courts noting that the continued applicability of rule 403 to all evidence admitted pursuant to these rules is an important factor in their constitutional validity.
 
 See, e.g.
 
 ,
 
 United States v. Coutentos
 
 ,
 
 651 F.3d 809
 
 , 819 (8th Cir. 2011) (holding that rule 414 of the Federal Rules of Evidence was not unconstitutional);
 
 United States v. LeMay
 
 ,
 
 260 F.3d 1018
 
 , 1031 (9th Cir. 2001) (same);
 
 United States v. Castillo
 
 ,
 
 140 F.3d 874
 
 , 883 (10th Cir. 1998) (same);
 
 see also
 

 People v. Falsetta
 
 ,
 
 21 Cal.4th 903
 
 ,
 
 89 Cal.Rptr.2d 847
 
 ,
 
 986 P.2d 182
 
 , 187-90 (1999) (holding that California's version of rule 413 was not unconstitutional, in part because review for undue prejudice was still required).
 

 This application of the Doctrine, it bears noting, is not widely used. In
 
 Verde
 
 , our supreme court relied largely on one law review article and one concurring opinion from California in extending the Doctrine's application to fabrication defenses.
 
 State v. Verde
 
 ,
 
 2012 UT 60
 
 , ¶¶ 47-48,
 
 296 P.3d 673
 
 . The court did state that "[m]any other courts have adopted the doctrine in these and similar contexts,"
 
 see
 

 id.
 

 ¶ 53 & n.27, but none of the cases the court cited for that proposition actually applied the Doctrine to a fabrication defense; indeed, all but one of them applied the Doctrine in its traditional context: to rebut a defense of accident or mistake,
 
 see
 

 Westfield Ins. Co. v. Harris
 
 ,
 
 134 F.3d 608
 
 , 615 (4th Cir. 1998) (stating that "the more often an accidental or infrequent incident occurs, the more likely it is that its subsequent reoccurrence is not accidental or fortuitous");
 
 United States v. York
 
 ,
 
 933 F.2d 1343
 
 , 1350 (7th Cir. 1991) (applying the Doctrine to rebut a defense of accident, stating that "the odds of the same individual reaping the benefits, within the space of three years, of two grisly murders of people he had reason to be hostile toward seem incredibly low, certainly low enough to support an inference that the windfalls were the product of design rather than the vagaries of chance"),
 
 overruled on other grounds by
 

 Wilson v. Williams
 
 ,
 
 182 F.3d 562
 
 (7th Cir. 1999) ;
 
 Wynn v. State
 
 ,
 
 351 Md. 307
 
 ,
 
 718 A.2d 588
 
 , 607 (1998) (stating that "[i]t is the objective implausibility of the occurrence,
 
 sans
 
 nefarious activity, which rebuts the claim of an innocent occurrence");
 
 State v. Johns
 
 ,
 
 301 Or. 535
 
 ,
 
 725 P.2d 312
 
 , 321-27 (1986) (applying the Doctrine to rebut a defense of mistake or accident);
 
 see also
 

 People v. Everett
 
 ,
 
 250 P.3d 649
 
 , 656-58 (Colo. App. 2010) (applying the Doctrine, based partly on statutory guidance, to rebut a defense of lack of consent). To my knowledge, very few other jurisdictions-in a reported majority appellate opinion-have applied the Doctrine to rebut a defense of fabrication.
 
 E.g.
 
 ,
 
 De La Paz v. State
 
 ,
 
 279 S.W.3d 336
 
 , 347 (Tex. Crim. App. 2009).
 

 I also concur with the majority's conclusion that the trial court did not abuse its discretion in balancing the contested evidence's probative value with its potential for unfair prejudice. In such situations, a trial court must conduct a separate rule 403 analysis, and may not simply conclude-based solely on a determination that there is a proper non-character purpose for the evidence-that the evidence is admissible.
 
 See
 

 supra
 
 ¶ 28 (describing the "three-step analysis" that a court must take, with the third step being rule 403 balancing). In this case, although the trial court discussed some of the doctrine-of-chances factors in connection with its rule 403 analysis-something it is allowed to do,
 
 see
 

 State v. Lowther
 
 ,
 
 2017 UT 34
 
 , ¶¶ 29, 41,
 
 398 P.3d 1032
 
 -it did not limit itself to those factors, and conducted a separate analysis of whether the evidence's probative value was substantially outweighed by the risk of unfair prejudice.